## Penn Iron Company, Limited, *v.* City of Lancaster.

*Equity—Preliminary injunction—Doubtful equity.*

On a bill in equity for an injunction where the equity of the plaintiff is doubtful, the right to preliminary relief in the form of a preliminary injunction is not made out.

*Equity—Preliminary injunction—Contract—Water company.*

On a bill in equity to restrain the city of Lancaster from carrying out a notice to shut off water supplied to plaintiff's mill because of a failure to pay a bill rendered for water, based on a meter rate, where the plaintiff asserts that the bill was a violation of a special contract with the city for a schedule rate per annum, a preliminary injunction will be dissolved where the evidence leaves it doubtful as to whether the equity asserted exists.

Argued Nov. 15, 1900. Appeal, No. 31, Oct. T., 1900, by plaintiff, from decree of C. P. Lancaster Co., Equity Docket

No. 3, page 301, dissolving preliminary injunction in case of Penn Iron Company, Limited, v. City of Lancaster et al. Before RICE, P. J., BEAVER, ORLADY, W. W. PORTER and W. D. PORTER, JJ. Affirmed.

Bill in equity for an injunction.

LANDIS, J., found the facts to be as follows :

### FINDINGS OF FA

The city of Lancaster is a municipal corporation, first duly incorporated as a city under the Act of March 20, 1818, P. L. 207. By section 5, of that act, it is provided, " that the power of corporation of the said city shall be vested in the select and common councils, who shall, in councils assembled, have full power and authority to make, ordain, constitute and establish such and so many laws, ordinances, regulations and constitutions (provided the same shall not be repugnant to the laws and constitution of the United States, or this commonwealth), as shall be necessary or convenient for the government and welfare of the said city, and the same to enforce, put in use and execution, by constable and other proper officers (whom they shall have power to appoint), and, at their pleasure, to revoke, alter and make anew, as occasion may require ; and shall have, hold and enjoy, in addition to the powers now vested in the borough of Lancaster, which are hereby transferred to, and vested in, the said councils, the like powers and authorities as are now vested by law in the select and common councils of the city of Philadelphia."

Subsequently, for the purpose of giving authority for the introduction into the city of a sufficient supply of fresh and pure water, the municipality was authorized, by the Act of March 21, 1836, P. L. 134, to acquire land and erect and maintain works. The 7th section of this act especially enacts that " the said mayor, aldermen and citizens of Lancaster, in select and common councils assembled, shall have full power and authority to pass, ordain and enact all laws and ordinances necessary to enable them to convey the said water through the city in all directions, and to fix hydrants and fire plugs wheresoever they may deem proper, and to fix and determine the uniform rates of prices to be paid by the citizens for the use of the said waters,

. . . . and generally to do all things requisite and necessary for carrying into full and perfect effect the objects contemplated by this act."

In pursuance of this last act, an ordinance, dated December 6, 1836, was passed by the city councils, section 2 of which reads as follows:

"Sec. 2. And be it ordained and enacted, so soon as a copious supply of water shall be introduced into the reservoir and ready for distribution, the water committee shall enter into contracts with any person who may desire the use of water, under such condition and equal regulations as fitting to the occasion may be established, and at such rents as shall be fixed by the water committee," and section 4 provides that "all rents for the use of water shall be payable in advance to the 1st day of April, next after the contract, and annually in advance from that day."

To further carry out the same objects, the ordinance of January 16, 1857, was adopted, section 3 of which provides that "the duplicate of water rent shall be, as heretofore made out on or before the first day of April yearly, and the mayor shall immediately thereafter deliver the same to the city treasurer, to whom the rent shall be payable at his office," etc., and section 4, that "it shall be the duty of the superintendent, on or before the first day of May, in each and every year, to leave at the premises of each water renter a printed or written notice of the amount of his or her rent, with an embodiment of the provisions of section 30, of this ordinance, relative to payment," and, afterwards, by section 1 of the ordinance of June 2, 1857, it was provided that "the water committee of the city of Lancaster are hereby authorized and empowered to make a just and equitable abatement from the assessment of the water rent, provided applications to that end be made before the 20th day of May."

Originally, all rents were fixed at a rate certain, but the water committee, on February 6, 1895, presented their report to councils, whereby a new schedule was established, and this report was adopted by councils and continues in force to this date. Under this schedule, certain classes are to pay specified rates, and others are to be measured by meter at five cents per thousand gallons; but rolling mills are not mentioned eo nominatim in the same. The following provisions, however, appear: "All use of water not enumerated in above list to be rated by

the superintendent of waterworks, and meters will be placed, at the cost of the city, in any case, and charge for measured water, instead of being governed by the foregoing schedule." " All meters will be set by an employee of the water department, and shall not be moved or disturbed without the permission from superintendent of waterworks." " Bills for measured water will be payable quarterly."

The plaintiff, which is a limited partnership, is located within the limits of the city of Lancaster, and, as the owner of a rolling mill, is engaged in the manufacture of merchant bar iron. It employs about 450 hands, and consumes daily over 150,000 gallons of city water, in addition to a quantity furnished by itself, and it cannot run its mill at this time without the city's supply. This company began business about the year 1879, and, since that time to the present, has been a consumer of city water. So far as appears from the testimony, the rate established for it was $400 per annum, and that sum has been paid yearly, and to October 1, last. In the years 1887 and 1888, this rate was increased to $800, but upon complaint being duly made to the water committee, the company was exonerated to the amount of $400 for these particular years, and thereby the old rate was maintained. There seems to have been no action taken subsequently, until the question of putting in meters was agitated, and, by consent, bills at the old rate of $400 per annum were, from time to time, presented and paid. In 1888 a four-inch meter was purchased by the city and placed on various establishments, to ascertain the amount of water consumed, the Penn Iron Works (the plaintiff) being one. No meter charge was, however, made at that time for the water then consumed, and the meter was subsequently removed.

From all the evidence, it may be safely found that, on or about April 1, 1898, or, perhaps, a little later, during the ensuing year, the superintendent of waterworks gave Mr. Burrowes, the manager of the plaintiff, verbal notice that a meter would be affixed to their place of business, and it was claimed by the city that no bill was rendered at that time, as was customary, at the fixed rate. Such a bill must, however, have been furnished soon afterwards, for the receipt produced for its payment is dated June 1, 1898. Some of the company's

officers thereupon appeared before the committee and claimed that they ought to have had timely notice to prepare themselves to use their own water, and these arguments having evidently been deemed, for the time, sufficient, no further action was taken thereon for another year. On January 26, 1899, a resolution was passed by the water committee that notice should be given the plaintiff and some other consumers that their places would be metered on the following April, and the clerk of the committee testifies that he mailed a notice to the Penn Iron Company, of which he has no copy, but which read as follows : " As you are a large consumer of water, after April 1, your water will be measured by meter." The plaintiff's officers have no recollection that any such notice was received. It was not returned to the sender, and be that as it may, it is admitted by Mr. Burrowes that Mr. Frailey told him, " they were going to put a meter on our works."

No meter was, however, placed in position to measure the water by April 1, but, during the latter part of September last, the water superintendent placed one on the main through which all the water passes which is used in plaintiff's works. There are no other consumers on this main, but there is a fire hydrant on Fulton street, between Plum and Ann streets, which receives its supply through it. This fire hydrant would, of course, unless some changes were made, be affected by the stopping of the water along the main, but there are three other fire hydrants in the immediate neighborhood, which would not be in any way disturbed. A bill for the water rent for six months was, on October 1, 1899, rendered by the city to the company, and, on October 21, 1899, the sum of $190 was received in payment, being the full amount charged, less five per cent.

No rate has ever been fixed, either by councils or the water committee, for establishments of this character, and no notice of the rate intended to be charged against the plaintiff was ever given to it, before the bill for $641.85, for 12,837,000 gallons was, on or about January 1, 1900, furnished to it; nor had any inquiry been made by plaintiff, nor any one for it, concerning the rate, although they had been notified of the introduction of the meter at time it was put in. No attention was paid to the bill and duplicate bill furnished to plaintiff, and the water superintendent thereupon, on March 2 last, notified the company

that, if the claim was not paid by the afternoon of March 3, the water would be shut off. To prevent him from carrying out this purpose, the plaintiff has filed his bill and obtained this preliminary injunction.

The meter was placed at plaintiff's mill without its consent, which was not asked, though not against its protest. The evidence produced, which is confined solely to the president of the company, has failed to conclusively convince us that the rate established, of five cents per thousand gallons, is exorbitant and unreasonable, and such allegation is expressly denied in the answer. It is the same rate as is paid by all other large and small consumers of water who pay for their consumption by meter rates.

It is unnecessary to make any finding of facts as to the allegations in the bill relating to the plaintiff having been deprived of a natural stream of water running through its premises, which would have been sufficient to give the necessary amount used by it in its business. Conceding this to be true, it is an entirely independent cause of action, and if the city has unlawfully deprived the company of its property rights in this regard, it must maintain them, not in a court of equity, but as a common-law court.

The court dissolved the injunction previously granted on the ground that the plaintiff's equity was doubtful, saying, " We do not, therefore, place the dissolution of this injunction upon the grounds of the denials in the answer, but upon the broader ground that there is a doubtful or no sufficient right set forth in plaintiff's bill."

*Error assigned* was the decree of the court.

*Appel & Appel* and *A. J. Steinman,* for appellant.—Injunctions have been granted in analogous cases: State v. Jersey City, 45 N. J. 246; Young v. Boston, 104 Mass. 95; Hassan v. Rochester, 65 N. Y. 516; Kemble v. Titusville, 135 Pa. 141; Brymer v. Butler Water Co., 172 Pa. 489; Baltimore & Harrisburg Ry. Co. v. Hanover, etc., Ry. Co., 13 Pa. C. C. R. 291; Whiteman v. Fayette Fuel Gas Co., 139 Pa. 492; Easton Pass, Ry. Co. v. City of Easton, 133 Pa. 505,

*J. W. Brown* and *Charles R. Kline*, for appellees.—Equity will not interfere in the administration of municipal affairs, except to prevent irreparable injury. The facts and circumstances must be alleged from which it may be seen that irreparable mischief will result: Dillon on Municipal Corporations (3d ed.), sec. 907; High on Injunctions (3d ed.), sec. 1240.

It is not a proper case for the interference of a court of equity, for the plaintiffs have an adequate remedy at law: Harrisburg App., 107 Pa. 102; Mann v. Easton, 2 Northampton, 177; Foster v. Philadelphia, 12 Phila. 511; Howard's App., 162 Pa. 374; Stroud v. Philadelphia, 61 Pa. 255; Com. v. Philadelphia, 132 Pa. 288; Silkman v. Water Commissioners, 152 N. Y. 327; McHenry v. Jewett, 90 N. Y. 58; Girard Life Ins. Co. v. Philadelphia, 88 Pa. 393.

OPINION BY WILLIAM W. PORTER, J., January 22, 1901:

This appeal is taken not from a final decree, but from an order dissolving a preliminary injunction. The plaintiffs asked that the city of Lancaster be restrained from carrying out its notice to shut off the water supplied to the plaintiffs' rolling mill because of failure to pay a bill rendered for water, based on a meter rate. We have already decided, in Rieker v. City of Lancaster, 7 Pa. Superior Ct. 149, that the city of Lancaster has the right to impose the meter system upon those using the city water, and have refused to reverse where the rate per thousand gallons was found by the court below to be reasonable. The questions of law settled by that case are not revived now. The plaintiffs assert that they had a special contract with the city for a schedule rate per annum, and that the attempt to introduce the meter rate during a current year was a violation of the contract. This, as the case is now presented, seems to be the ground upon which the bill rests. The court below reviews the proofs and law at some length. There seems to be a finding of fact upon the evidence presented, that no such contract as that asserted existed. But the court, evidently not desiring at a preliminary hearing to base its decree on findings which would better be postponed to a final hearing on the merits, put the order for dissolution upon the ground that where the equity of the plaintiffs is doubtful, the right to the preliminary relief prayed for, is not made out.

A scrutiny of the pleadings and evidence submitted to the court below leads us to confirm the order made. The proofs, in our opinion, are not sufficiently clear to support any other decree. A final hearing will afford opportunity to the plaintiffs to present their case in full. We pursue the discussion no further lest we might embarrass the consideration of the case on its return to the court below.

The order is affirmed.